**Raymond A. Jett, Jr.**
**Plaintiff, Pro Se**
**170 Emily Drive**
**Chadbourn, N.C. 28431**
**(910) 516-2246-Phone**
**(910)516-2124-Fax**
**rjettjr65@gmail.com**

FILED

DEC 1 9 2023



PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## CIVIL DIVISION

RAYMOND A. JETT, JR.,
TARA S. JETT,
I.R.J(minor)
M.R.J(minor)
J.R.J(minor)
J.T.J(minor)

                Plaintiff, Pro Se

vs.

THE COUNTRY ACRES ASSOCIATION
OF COLUMBUS COUNTY LTD
GEORGE PARKER COLEMAN
MICHAEL P. COLEMAN
MITCHELL C. POWELL
C. MARTIN SCOTT
EARLENE FLOWERS
PERRY FRINK
KEYSHA FRINK
ANDREA WILLIAMSON
BOBBY HAMMONDS
TINA HAMMONDS
SYLESTE SMITH
LAKEESHA MCCELLON
SHENKA BANKS
MARQUETTE BANKS

Case No.: 7:23-cv-61674-M

Hon.

**Jury Trial Demand**

REQUEST FOR PERMANENT
INJUNCTION
VIOLATION OF FAIR HOUSING ACT
CIVIL FRAUD,
CIVIL CONSPIRACY
VIOLATION OF FTC ACT SECTION
5(A)(1)
DEFAMATION, LIBEL AND SLANDER
DEPRIVATION OF CIVIL RIGHTS
VIOLATION OF CIVIL RIGHTS
RACIAL DISCRIMINATION

1

VALENTIN VILLAFUERTE
MARGARITA VILLAFUERTE
WILLIE GODFREY
ANNA GODFREY

                    Defendants.

# COMPLAINT

## JURISDICTION

1. This court has jurisdiction over this action pursuant to **29 USC. §1331** (Federal Question) and **28 U.S.C. §1343(a) (3)** and **(4)** deprivation of rights).

2. This Court also has supplemental jurisdiction to hear Plaintiffs state law claims pursuant to **28 U.S.C. §1367**.

## VENUE

3. Venue is proper pursuant to **28 U.S.C. §1391**(b) because the events that gave rise to this action occurred in the Eastern District of North Carolina and defendants reside in the Eastern District of North Carolina.

## PARTIES

4. Plaintiff Raymond A. Jett, Jr. is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 170 Emily Drive, Chadbourn, N.C. 28431. He currently lives in the Eastern District of North Carolina.

5. Plaintiff Tara S. Jett is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 170 Emily Drive, Chadbourn, N.C. 28431. She currently lives in the Eastern District of North Carolina.

6. Plaintiff I.R.J. (minor) is a resident of the State of North Carolina, Who, at the time of the events that gave rise to this case, resided at 170 Emily Drive, Chadbourn, N.C. 28431. She currently lives in the Eastern District of North Carolina.

7. Plaintiff M.R.J (minor) is a resident of the State of North Carolina, Who, at the time of the events that gave rise to this case, resided at 170 Emily Drive, Chadbourn, N.C. 28431. She currently lives in the Eastern District of North Carolina.

8. Plaintiff J.R.J. (minor) is a resident of the State of North Carolina, Who, at the time of the events that gave rise to this case, resided at 170 Emily Drive, Chadbourn, N.C. 28431. She currently lives in the Eastern District of North Carolina.

9. Plaintiff J.T.J. (minor) is a resident of the State of North Carolina, Who, at the time of the events that gave rise to this case, resided at 170 Emily Drive, Chadbourn, N.C. 28431. He currently lives in the Eastern District of North Carolina.

10. Defendant Michael F. Coleman is a resident of the State of North Carolina, Who, at the time of the events that gave rise to this case, resided at 1436 Princess Ann Road Drive, Chadbourn, N.C. 28431. He currently lives in the Eastern District of North Carolina.

11. Defendant George P. Coleman is a resident of the State of North Carolina, Who, at the time of the events that gave rise to this case, resided at 1436 Princess Ann Road, Chadbourn, N.C. 28431. She currently lives in the Eastern District of North Carolina.

12. Defendant Mitchell C. Powell is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 73 Church Street, Cerro Gordo, North Carolina 28430. He currently lives in the Eastern District of North Carolina.

13. Defendant C. Martin Scott is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 417 Timber Cove Drive, Whiteville, North Carolina 28472. He currently lives in the Eastern District of North Carolina.

14. Defendant Earlene Flowers is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 64 Emily Drive, Chadbourn, N.C. 28431. She currently lives in the Eastern District of North Carolina.

15. Defendant Perry Frink is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 101 Emily Drive, Chadbourn, N.C. 28431. He currently lives in the Eastern District of North Carolina.

16. Defendant Keysha Frink is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 101 Emily Drive, Chadbourn, N.C. 28431. She currently lives in the Eastern District of North Carolina.

17. Defendant Andrea Williamson is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 701 East 1st Avenue, Chadbourn, N.C. 28431. She currently lives in the Eastern District of North Carolina.

18. Defendant Bobby Hammonds is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 135 Emily Drive, Chadbourn, N.C. 28431. He currently lives in the Eastern District of North Carolina.

19. Defendant Tina Hammonds is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 135 Emily Drive, Chadbourn, N.C. 28431. She currently lives in the Eastern District of North Carolina.

20. Defendant Lakeasha McClellan is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 227 Emily Drive, Chadbourn, N.C. 28431. She currently lives in the Eastern District of North Carolina.

21. Defendant Shenicka Banks is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 241Emily Drive, Chadbourn, N.C. 28431. She currently lives in the Eastern District of North Carolina.

22. Defendant Marquette Banks is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 241 Emily Drive, Chadbourn, N.C. 28431. He currently lives in the Eastern District of North Carolina.

23. Defendant Valentin Villafuerte is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 489 Emily Drive, Chadbourn, N.C. 28431. He currently lives in the Eastern District of North Carolina.

24. Defendant Margarita Villafuerte is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 489 Emily Drive, Chadbourn, N.C. 28431. She currently lives in the Eastern District of North Carolina.

25. Defendant Willie Godfrey is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 310 Emily drive, Chadbourn, N.C. 28431. He currently lives in the Eastern District of North Carolina.

26. Defendant Anna Godfrey is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 310 Emily drive, Chadbourn, N.C.

28431. He currently lives in the Eastern District of North Carolina. She currently lives in the Eastern District of North Carolina.

27. Defendant Teresa Smith is a resident of the State of North Carolina, who, at the time of the events that gave rise to this case, resided at 415 Emily Drive, Chadbourn, N.C. 28431. She currently lives in the Eastern District of North Carolina.

## **INTRODUCTION**

1. The Plaintiffs now bring this action under **42 U.S.C. §1982** for racial discrimination, unlawful interference with their right to hold property and for retaliatory actions, **42 U.S.C. §3601** for violation of the Fair Housing Act which prohibits discrimination by direct providers of housing, such as landlords and real estate companies as well as other entities, Retaliation, intimidation, or interference related to exercising a fair housing right. **42 U.S.C. §12101** for violation of American with Disabilities Act for imposing harsh and cruel fines and penalties on the disabled and reasonable accommodations. Retaliation, intimidation, or interference related to exercising a fair housing right.

2. The Plaintiff also seeks relief under state law for ethnic intimidation, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence.

3. Plaintiffs Raymond A. Jett, Jr., a disabled veteran, his wife Tara S. Jett and four minor children, bring this civil rights action against defendants George P. Coleman, Michael F. Coleman, Mitchell C. Powell and C. Martin Scott along with other named

6

defendants because their racist, violent threats and retaliatory actions towards the plaintiff and his family.

4. In 2021, the Jett's, who own their home and who are an interracial couple with bi-racial children asked the defendant Coleman, G. and Coleman M. during previous interactions to stop riding their ATV's and/or /Motorcycle up and down Emily Lane during late night hours and indicated to both Coleman's that Emily Lane is a private road to be utilized by the residents of the county Acres Association of Columbus County which just happens to be an established homeowners associations created in 2003.

5. The defendant Coleman, G. continued to ride his ATV up and down Emily Lane which happens to have a loud muffler and would awake the minor children in the late night hours causing them scream because of the noise and not to be able to return to sleep for school the next day.

6. The plaintiff explained to the defendants and provided a copy of the subdivision street disclosure statement identifying Emily Lane as a private road and for use by the owners of the lots in the sub-division and it is the responsibility of the homeowners who reside on Emily Lane.

7. The defendant Coleman, G. began harassment of the plaintiffs as early as 04/18/2022 just after being hand delivered a copy of the street disclosure statement. The defendant Coleman, G. would ride his ATV up and down Emily Lane harassing the plaintiffs by revving his ATV in a loud manner only in front of the plaintiffs home and at various hours of the day and night to make it known that he was on the plaintiff property and/or out front of the plaintiffs property.

8. On **05/30/2022 @ 8:37 pm**, the plaintiff had to place a call to the Columbus County Sheriff Department 911 dispatch in which Deputy J. Garcia responded to the plaintiff home due to defendant Coleman, G. was in front of the plaintiffs home yelling racial slurs attempting to describe the plaintiff "**black bitch**" and seeking for the plaintiff to come outside and all the while putting up his middle finger at the plaintiff while the plaintiff was in his yard behind a fence.

9. On **06/11/2022 @ 01:20 am**, the plaintiff again had to place a call to the Columbus County Sheriff Department and request that a deputy or patrol supervisor be dispatched to the plaintiff home due to the defendant Coleman, G. was in front of the plaintiffs home revving his ATV and thereby awaking the plaintiffs and the plaintiffs children with the loud ATV which sounded like it had no muffler.

10. On **06/19/2022 @ 7:13 pm**, the plaintiff witnessed the defendant Coleman, G. ride his ATV down Emily Lane and then back out of the sub-division while drinking a can of beer and having a young child riding on the back of the ATV and looking for the plaintiffs in their yard space.

11. On **07/25/2022 @ 7:57 pm**, the defendant Coleman, G. came down Emily Lane from Princess Ann Road, he slowed when he saw the plaintiff standing in his garage and then he stopped his ATV in front of the plaintiff's home. The defendant Coleman, G. just sat there in front of the plaintiff home and began to mumble words, the plaintiff didn't respond but rather just watched the defendant. The defendant began to speak louder in which he stated **"Bitch Ass Nigger"**, he then started his ATV and made a U-turn and began to exit Emily Lane while the minor children was witnessing the defendants action from their bedroom window.

12. On every occasion that recorded the defendants interaction and documented in the attached exhibit (ATV Four Wheeler Up/Down the Sub-Division Street) the defendant has made it known that he was in front of the plaintiffs home on his ATV and on the plaintiffs property by either revving his ATV motor or making a u-turn in front of the plaintiffs property with a loud ATV.

13. On **07/30/2022 @ 11:57 pm**, the defendant Coleman, G. again rode his ATV down Emily Lane stopping in front of the plaintiff's home and began yelling racial slurs **"You Nigger"** in front of the plaintiff's home while the minor children was witnessing the defendants action from their bedroom window.

14. On 07/30/2022 @12:01, The defendant Coleman, G. was in front of the plaintiff's home where he began to throw beer cans at the plaintiff's home and leaving them on the front lawn while the minor children was witnessing the defendants action from their bedroom window .

15. On **08/05/2022 @ 11:57 pm**, the plaintiff was standing in his driveway waiting for his wife to return home after he received a call that she was on her way and wanted the plaintiff Jett, R. to meet her outside because when the plaintiff wife left the home she noticed the defendants in their driveway. The defendant Coleman, G. rode his ATV down Emily Lane and spotted the plaintiff standing in front of his garage. The defendant Coleman, G. passed the plaintiff home, made a u-turn and stopped his ATV and turned it off in front of the plaintiff home and he began to question the plaintiff, the plaintiff did not reply to him at which time the defendant Coleman, G. stated **"You Black Bitch, I am going to kill black your ass".** The defendant Coleman, G. was told to get out of in front of the plaintiff home. The defendant Coleman, G. began

9

to egg-on the plaintiff to come up to the beginning of the driveway where he was standing. The plaintiff at this point pulled out his cell phone and began to record the interaction. The defendant Coleman, G. stated **"I know who your wife is that fat white bitch and your ugly bi-racial kids".** While this interaction was taken place the plaintiff noticed a white pickup truck driving down Emily lane and stopped in front of the plaintiff home.

16. The driver was identified as defendant Coleman, M. who got out of his truck and walked over to Coleman, G. and they both began to yell at the plaintiff using racial slurs **"You stupid black mother fucker"** toward the plaintiff.

17. The defendant Coleman, M. stated that he spoke to the developer Mitchell C. Powell who happens to be his personal friend and the developer of the sub-division and it was related by defendant Coleman, M. that the plaintiff Jett, R. was a trouble maker and that he knows that there will never be an HOA here.

18. The defendant Coleman, G. and Coleman, F. blocked the plaintiff's driveway so that the plaintiff's wife could not enter the property and the plaintiff immediately called his wife and related that the driveway was blocked by the defendants and to wait until she see the sheriff come past her stopped location.

19. The Plaintiff Jett, R. called the Columbus County Sheriff Department to report the incident of his driveway being blocked.

20. Prior to March 2021 the plaintiff and Defendant Powell had an agreement to purchase additional lots within the subdivision on either side of the plaintiffs home and across the street from the plaintiff home with plaintiffs signed contracts.

21. On March 19th 2019, the plaintiff deposited 10% amount on two separate lots which sits on either side of the current plaintiff property of lots #8 and #12.

22. On June 3rd 2020, the plaintiff deposited 10% amount on one additional lot which sits across the street from the plaintiff's property of lot5-B. Also the plaintiff had an oral agreement to purchase lots #9 and #11 which was later reduced to a written contract and delivered his lawyer.

23. On March 15th, 2022 the defendant Powell came to the plaintiff property irate and began to yell at the plaintiff after speaking to the defendants Coleman, M. and citing that there is no HOA and he never received notice that the plaintiff's provided the 10% down payment to the office of defendant Scott with contracts for the pending lot sale.

24. The plaintiff did provide prior personal notice to Powell that the deposit was paid and had several conversation with defendant Powell and Scott throughout the years but rather the plaintiff believes that both defendant Powell and Scott was retaliating against the plaintiff because the plaintiff found that they were being deceitful in the land deals and not telling the homeowners in the sub-division the absolute truth and the fact the plaintiff was challenging the fact that the defendants Coleman's, was using the main road as his personal race track.

25. After providing the 10% down payment to Defendant Scott for the 3 lots defendant Scott never recorded 1 of 3 deposits and in fact every since the initial deposit on March 01, 2019 and again on June 3rd, 2020 Defendant Powell and Defendant Scott kept giving the plaintiff the run around for years for the finalization closing of the sale of the lost.

26. The plaintiff sort to close on the lots within 45 days of the execution of the contracts whereas the defendants dragged out the closing for lots #8 and #12 for 5 years.

27. The plaintiff in the meanwhile was exercising his due diligence and doing the proper property search which revealed several disturbing item which was presented Powell and he became irate with the plaintiff while visiting the plaintiff at his home.

    i.   Main Road needed repair

    ii.  Waterline was undersized

    iii. There was a Homeowners Association HOA but was never disclosed to the property owners or potential buyers.

    iv.  There was never a notice pursuant to the N.C.G.S that each homeowner was put on notice that they are responsible for the road maintenance and in fact Powell kept telling the homeowners that the state would take over the road and repair it when in fact he knew the road is listed a private road.

    v.   That there was no Homeowners Association (HOA)

    vi.  That the defendant Coleman, G and Coleman, M. was using the main road of Emily Lane as their own private race track.

    vii. That the defendants Coleman, G. and Coleman, M. was riding up and down Emily Lane with shot guns on their lap chasing after people pets who live in the sub-division.

    viii. Mitchell Powell created a hostile living environment because he didn't fully disclosed that there was a HOA, that now the homeowners are responsible for the only road into and out of the subdivision and further the cost of the repair of the road now exceeded **$450,000.00.**

28. In one conversation that the plaintiff Jett, R. had with Defendant Powell he requested to know "**what type of Black are you**" after diverging what he found in regards to the subdivision!

29. Defendant Powell further would make statements to the plaintiff Jett, R. that another homeowner Keith Mercure threw the plaintiff Jett, R. under the bus about the pending land deals and when questioned would not further elaborate.

30. The plaintiffs Jett, R. counter sued Keith Mercure for spotty work that he performed for installation of a metal roof on the plaintiffs' home and with Plaintiff Jett, R. prevailing in Small Claims Court of Columbus County.

31. Defendant Powell concluded eight or more land deals over the last five years within the same subdivision of the plaintiff while putting the plaintiffs off for five (5) years and keeping the plaintiffs deposit, not communicating in respect to the deals and or any accumulated interest for his deposit being withheld in retaliation.

32. Defendant Scott who happens to be the attorney representing the defendant Powell also refused to conclude the real estate deal and/or provided any written communications in regards to the status of the land deals.

33. Plaintiff sent several written correspondence to defendant Scott in regards to the land deals only never to get any such responses.

34. Plaintiff would go to defendant's Scott office to inquire as to the status of the land deals only to be told that they would be proceeding soon.

35. Plaintiff had to resort to filling a formal notice of demand to defendant Scott to conclude the land deals.

36. Plaintiff had to file a formal notice with the North Carolina State Bar under file **#23G1039** in regards to the manner and substance of the land deals that Scott was directly involved with on behalf of defendant Powell.

37. When defendant Scott was contacted in regards to finalizing of the land deals defendant Scott related that Powell decided to go another direction and when the plaintiff requested to refund defendant Scott related that he lost the monies and/or file and sarcastically related to the plaintiff that he would have to go back to the bank which issued the 10% cashier check and place a stop payment on the certified funds which defendant Scott held for 2 years and knowing that the original bank BB&T was no longer in existence.

38. Plaintiff Jett, R. having being told for 4.5 years that the process of finalizing the land deals was being formulated but never happened until August 3rd, 2023 and in the mean time they kept his monies and any interest that accrued.

39. There was never a notice pursuant to the N.C.G.S that each homeowner was put on notice that they are responsible for the road maintenance and in fact Powell kept telling the homeowners that the state would take over the road and repair it.

    i. Under North Carolina Law, a developer is obligated to record a map and delineate the roads as either public or private. The law also requires the right away and design of streets designated as public to "be in accordance with the minimum right of way and construction standards established by the Board of Transportation for acceptance on the state highway system**." In addition, prior to entering any agreement or any conveyance with any prospective buyer, the developer has to prepare and sign, and the buyer of the**

**subject real estate must receive and sign an acknowledgement of receipt of a separate instrument known as the subdivision streets disclosure statement.** The statement has to completely disclose the status (whether public or private) of the street upon which the house or lot fronts and if the street is designated by the developer and seller as a public street, the developer and seller shall certify that the right of way and design of the street has been approved by the division of highways, and that the street has been or will be constructed by the developer and seller in accordance with the standards for subdivision streets adopted by the board of transportation for acceptance on the highway system."

40. Defendant Powell and thru his attorney only filed the street disclosure statement with the register of deeds and not with the individual homeowners which is violating state law.

41. The plaintiff after being advised by the Planning Board of Columbus County, Director Gary Lanier that the Country Acres subdivision would never have gotten permits because Powell failed to properly disclose to the Board at the time for permitting that who would maintain the road and that he tried to resolve his issues by stating that the homeowners would assumes responsibility.

42. Defendant Powell then later in 2003 came up with the Covenant, Conditions and Restrictions (CCR) which he kept for himself until challenged by the Plaintiff in 2016 but by then the County of Columbus had already decided that they would wash their hands from any further actions in regards to the Country Acres Subdivision.

43. In 2016 the Plaintiff received the CC&R's attempted to hold meeting and advising the then homeowners of the CC&R's for which allot of homeowners detailed to the plaintiff that they were never told about the subdivision being in HOA.

44. In a meeting with Defendant Powell and Scott the plaintiff related his concerns about the homeowners not being told about the HOA and defendant Scott related that "Tuff Luck" they should have read their paperwork prior to signing".

45. As a direct and proximate result of defendant Powell labeling the plaintiffs as troublemakers because his refusal to tell the truth in regards to the Sub-Division, the plaintiffs have suffered and continue to suffer from significant and enduring emotional distress including humiliation, mental anguish and physical distress, and injury to mind and body.

46. The defendant Powell thru Defendant Scott used his office and means to deprive the plaintiffs of fair and proper real-estate accommodations in that they withheld various real estate transactions for several years as form of retaliation against the Plaintiffs and for Retaliation, intimidation, or interference related to exercising a fair housing right For seeking to enforce the developer to abide with his Homeowners Association rules (CC&R's)

47. The plaintiff contacted the Sub-division developer Mitchell Powell (defendant) to look into the various items that needed repair in the Sub-Division specifically the main road and the flood drains. Defendant Powell directed that the plaintiff to seek the cost of the repair of the road by any road paving companies and/or the cost of the materials. The plaintiff contacted Parker paving and sought an estimate to seal coat the main road of Emily Lane and provide the information as to what the cost would

be to seal coat the main road since the road has never been done since it was installed in 2003.

48. The defendant was provided with written quotes from Parker paving quoting between **$8,000.00** and **$12,000.00** to seal coat and fix the pot holes of the main Road of Emily Lane. The defendant after being given the quotes related that he has the equipment in his junk yard to do the seal coating and that he would just have to find a place to purchase the seal coating materials and that he would do the seal coating himself. The plaintiff also provided the cost of the materials for the seal coating as well however defendant Powell didn't purchase the materials because the road was never seal coated.

49. Defendant Powell was contacted in regards to some nuisance activity in the subdivision of cars drag racing, cars speeding on Emily Lane, multiple cars being towed to a resident home, 18 wheeler truck parking on the street and school buses can't get pass, homeowners animal being hit by a speeding vehicle and that something needed to be done also in regards to the illegal dumping at the end of the road and non working street lamps.

50. Defendant related that he has the Covenants, Conditions, and Restrictions which he filed with the register of deeds in 2003 and that they could be enforced to stop the nuisance activity. Defendant Powell provided the plaintiff and another resident with copies of the Covenants, Conditions, and Restrictions and directed that the plaintiff to review the documents. Upon the plaintiff reviewing the documents, the plaintiff responded to the defendant that the Covenants, Conditions, and Restrictions should have been enforced as far back as 2003 in the subdivision.

51. The plaintiff also suggested installing speed bumps on Emily Lane to slow down the vehicles and the defendant also directed that it was okay to purchase the speed bumps and install them in the Sub-Division. The plaintiff made a purchase of the speed bumps and had them delivered to his residence at a cost of **$5,296.72** The following day after of the arrival of the speed bumps the plaintiff began to the installation of the speed bump and defendant stop by to see the results along with the defendant making suggestion that the speed bump should not be close together and after further discussion it was decided that the speed bump be placed at approx. 300 feet apart.

52. The Defendant Powell suggested that the homeowners need to have a meeting and directed that the Plaintiff put out a letter to all homeowners informing them that a meeting will be conducted to put in place the Covenants, Conditions, and Restrictions. This first initial meeting was held and during this meeting of the attended residents they decided to vote, to appoint a board, to choose an executive board to manage the HOA. During this meeting which the defendant Powell was present, the plaintiff was appointed as President of the Home Owners Association board. After the first meeting was concluded the following day the plaintiff began to review all the required documents that established the homeowners association and found that the association was in default with its filing before the North Carolina Secretary of State, in fact the association was suspended effective 10/11/2010 for failure to comply with the requirements of the Department of revenue pursuant to N.C.G.S. §105-230(a), the plaintiff contacted the NC Dept. of Revenue and submitted written correspondence to have the homeowners association re-instated along with a fee of **$100.00** and the

defendant was provided with written correspondence that the homeowners association was re-instated.

53. The Plaintiff had to contact State Farm fire and Causality Company to secure general liability insurance at an initial cost of **$225.00** due to the defendant did not have insurance in place for the homeowners association pursuant to N.C.G.S §47-F.

54. The plaintiff had to purchase the required street name sign, stop sign and other signage which reflects that Country Acres is a private community along with the proper mounting poles and hardware at a cost of **$712.36**.

55. The defendant required that the Board take over the payment for the street lights for the subdivision which was in the defendant's personal name. The plaintiff had to apply to the Brunswick electric company for an account in the name of the homeowners association which required that a deposit of **$250.00** and since the defendant refuse to help implement the HOA the residents refused to pay their association dues and thereby the street light was repossessed by 1`Brunswick Electric Co-op. The plaintiff paid the street light bill for two additional months until the repossession at a cost of **$271.36**

56. While the plaintiff was getting the homeowners association on line, the defendant unbeknown to the homeowners and thru his attorney filed a Subdivision Street Disclosure Statement reflecting that the road will be maintained by the homeowners of the subdivision effectively putting the cost of the repair of the road and flood drains on the shoulders of the homeowners without their consent or knowledge thereof.

57. As outlined in the Covenant, Conditions and Restrictions, the residents are required to pay dues and the defendant has refused to collect the homeowner's dues, in fact the defendant has made statements to various residents and to the plaintiff that he will not be enforcing the homeowners association, there is no homeowners association and/or you have to give the homeowners a little bit at a time repeatedly in violation of **N.C.G.S. § 47-F.**

58. The defendant shortly after September 2017 stop allowing meetings of the homeowners association and subsequently removed the speed bumps from the road and delivered them back to the property of the Plaintiff. The plaintiff and defendant previously had conversations in regards to the speed bumps due to residents making claims that the speed bump was delaying the school bus, preventing the mail carrier from making deliveries and the trash pickup service. The plaintiff provided assurance that all three services was consulted with prior to the installation of the speed bumps and the plaintiff warned the defendant that these issues will come to light based upon the residents refusal to comply with change and the fact that the defendant never appropriately ensured the homeowners association was put in place at the time of each homeowners purchase of their land in the sub-division.

59. After the defendant filed the Street disclosure statement the plaintiff began to look into the allegations that the state will be taken over the road. The plaintiff made contact with North Carolina Dept. of Transportation and it was revealed that no such action will occur for Emily Lane due to the road does not meet the minimum requirements to be incorporated into the state system. One of the factors is that the defendant never secured architecture statements for the road and the plaintiff was

directed to consult with a civil engineer about putting Emily Lane into the state road system.

60. On April, 16ᵗʰ, 2021 the plaintiff had a consultation with Civil Engineer from the firm of Anderson Engineering & Associates, P.A. located in Lumberton, N.C. in regards to Country Acres Sub-Division in particular the road that allows entry and exit to the sub-division, detail information as to what the residents was experiencing in the Sub-Division, The engineer was able to pull up country acres street address thru mapping and give the plaintiff detail information in regards to the country acres Sub-Division it was declared that:

    i. The road size is not wide enough.

    ii. The condition of the road would not meet DOT, County or Chadbourn City Standards because an old DOT process of laying a paved road was used.

    iii. The water line that services Country Acres Sub-Division is not large enough currently 3" which over time and the installation of more homes the decrease or lack of water pressure.

    iv. The road which was installed was from an old DOT formation of laying rock and then coming back over it with a spray compound that hardens but will later deteriorate.

    v. No fire hydrant.

    vi. The cul-de-sack is in bad formation and pulling away from the road.

    vii. Drainage ditches on either side of the road are not position correctly and are not deep enough to allow water to drain off.

     **viii.**   Flood drains are not sized correctly and/or sealed.

     **ix.**  Sink holes that are forming on the either side of the flood drains are due to the drains not installed correctly and sealed.

     **x.**  Sink Holes in the Sub-Division adjacent homes are due to too much top soil being removed during the building process and not enough of compaction of the Sub-Division soil layers.

61. The plaintiff asked how these items could be corrected to prevent the furtherance of deterioration, it was suggested that the HOA produce a better CC&R and focus on maintenance with a budget to fix or repair what was already done. It was suggested that the water line be replace and upgraded to 6" and install a fire hydrant for the neighborhood, replace and upgrade the flood drains, re-trench the ditches on either side of the road while at the same time widen the main road at least 6 feet (3 feet on either side), flood drains replace and or repair what is already installed to stop the leak causing the sink holes. As far as the road it would be too costly to remove the road and install a new one which would be required to meet DOT and County standards.

62. The plaintiff further asked what would It take to repair the road and it was suggested that the road could be resurfaced with 2 inches of new black top and sealed and maintained every 5 years to prevent further road damage and stop heavy loads from traveling on it, also noted that even with the road being resurfaced DOT or Columbus County would never consent to take over the maintenance of the road because the underlying condition of the initial installation of the road and that Country Acres main road will always be a private road and must be maintained by the residents and

this cost would exceed **$450,000.00** for the road alone and not considering the flood drains repair at a cost that could exceed **$100,000.00.**

63. Defendant Scott acting as the legal representative for the country acres association of Columbus County, Ltd. and for Defendant Powell in conflict of state law failed to direct and/or advise his client Defendant Powell to follow state law in that directing his client to hold HOA annual meetings, ensuring that the HOA documents are up to date, Development and enforcement of Articles of Incorporation, Bylaws, CC&R's and other governing documents. Defendant Scott failed to Counsel on interpretation of governing documents, Notification of CC&R violations and application of penalties and collecting delinquent assessments. Defendant Scott when presented with a quote for the road maintenance and repair cost directed that the quote not be signed and then directed Defendant Powell to transfer the road maintenance and/or repair onto the homeowners without their knowledge or consent which will cost the homeowner upwards of **$450,000.00** when the installed road never meet state or county standards. Defendant Scott is liable for aiding and abetting by silence or inaction and was aware of illegal activity taking place and failed to take any action to prevent or report Defendant Powell for not following the state law governing the homeowners association namely; The Country Acres Association of Columbus County, Ltd. Defendant Scott further conspired with Defendant Powell to continue in aiding and abetting his activities of bypassing the Columbus County Commissioners authority to only produce 6 lots every 3 years. Defendant Scott along with Defendant Powell produced seller financing for lot in the Country Acres Subdivision and thereby put the lots under Defendant Powell name to circumvent the county commissioner's

plan and then withheld the filing of documents from the register of deeds until some later date and time.

## STATEMENT OF FACTS

### INTIMIDATION

64. From 2008 to 2023, The plaintiffs resided at their owned property of 170 Emily Drive, Chadbourn, Columbus County, North Carolina 28431

65. Beginning In 2021, Coleman, G. began to threaten and harass the plaintiffs because the plaintiff Jett, R. was actively moving the homeowners association into compliance and the defendants are known friends of the developer Mitchell C. Powell who the plaintiff did not have an ongoing friendly relationship with after finding out that Powell was deceitful about the HOA and repairs that the road needed and the defendants acts of intimidation are from the plaintiff moving the HOA into compliance and the events that gave rise to this case.

66. The plaintiffs resides in a private community namely The Country Acres Association of Columbus County Ltd. formed in 2003 and the defendants resides outside of the private community but have been allowed full access to the sub-division by developer Mitchell C. Powell.

67. The defendants were unfriendly to the plaintiffs ever since the plaintiff began to enforce and bring the subdivision into compliance with the state laws at the advice of defendant Powell.

68. Defendant Powell attended a community meeting with the homeowners of the Country Acres Association of Columbus County, Ltd at the Plaintiffs home in which those attended voted and appointed the Plaintiff Jett, R. as the association president.

69. The defendants are friends with defendant Powell and were allowed to use land within the subdivision with unfettered access.

70. While legal disputes where ongoing defendant Powell attempted to terminate the HOA but realized he couldn't on his own and instead defendant Powell listed the help of eight other residents to terminate the HOA and thereby dissolving himself of any further liability and thereby dropping the repair cost of the road upon the plaintiffs and other homeowners to the tune in the excessive of $450,000.00.

71. The defendant Powell and defendant Scott further failed or refuse to provide the plaintiff and/or any other homeowner that resides within the sub division with notice pursuant to N.C.G.S. that they are responsible for the road maintenance for their plots of land.

72. Instead the defendants attempted to hide the street disclosure notice within the register of deeds.

## CONSPIRACY

73. Defendant Powell enlisted the help of eight homeowners who originally claimed that they never knew of the HOA existed to terminate the HOA and to drop the road maintenance onto the homeowners.

75. These eight homeowners refuse to bargain in regards to the maintenance and upkeep of the main road and defendant Powell never put in place a road maintenance agreement thereby leaving the plaintiff and other homeowners with a road that will never be repaired or upkeep.

## COVERUP

76. The defendant Powell pushed his own lies in regards to the homeowners association and used plaintiff Jett, R. as his scapegoat for failing to properly disclose the status of the HOA.

77. After the plaintiff exposed the defendant Powell he retaliated against the plaintiff by:

    a. Held the final closing for the purchase of lots #8 and #12 or five years

    b. Refuse to sale lots #9 and #11 to the plaintiff

    c. Sort the help of other homeowners to terminate the HOA

    d. Had one family of homeowners who was never a part of the HOA to sign the termination papers which causes the termination of HOA to be voided because the termination falls short of the required 80% of homeowners.

    e. Had each husband and wife family member of each purchased lot sign the termination of HOA when each lot consists as one vote or one combined signature per household/lot.

    f. Never disclosed to the homeowners that they are responsible for the road maintenance.

    g. That the original filing for the HOA was a sham to get by the Columbus County Planning Board permitting process.

## RETAILATION

78. In the summer of 2021 and 2022, Coleman, G. repeatedly was observed driving vehicles up down Emily drive with loud mufflers and revving the vehicle (ATV) engine only while in front of the plaintiff's home.

79. During the summer month of June 2023 plaintiff sort the help from a private attorney in regards to the pending contracts. This attorney advised the plaintiffs that Defendant Scott and Defendant Powell was doing what is called "bait and switch"

    a. "Bait and switch" advertising is grounds for an action of common-law fraud, unjust enrichment, and sometimes breach of contract. A "bait and switch" is also a violation of the Consumer Fraud and Deceptive Business Practices Act.

80. The defendants Powell and defendant Scott retaliated against the Plaintiffs by wrongfully refusing to approve the sale of lots #9 and #11.

81. The defendants Powell and Scott retaliated against the Plaintiff by withholding the sale of lot #8 and #12 for five years and keeping the plaintiff's deposit and any interest that may have accrued.

82. In the furtherance of retaliation defendant Powell and Scott changed the finance rate for lots #8 and #12. During the onset of closing the sale of the lots defendant Powell told the plaintiffs that the finance rate would be locked in at 5.9 percent and plaintiffs completed the contacts with this rate.

83. During the closing of the sale of lots #8 and #12 defendant Scott related that the plaintiffs made up the finance rate and that this rate was not relayed by defendant Powell and that defendant Powell wanted 6.9% which amount to approx. $2,000.00 in additional finance fee's.

## CAUSE OF ACTION
## **COUNT I**
### VIOLATION OF 42 U.S.C. §1982

84. The Plaintiffs realleges and reincorporate by reference as if fully set forth herein allegations in all preceding paragraphs.

85. **42 U.S.C. §1982** provides, in relevant part, that "[a]ll citizens of the United States shall have the same right as is enjoyed by white citizens to ….. Hold real and personal property".

86. The right to "hold" one's property includes the right to use one's property.

87. The plaintiffs are an interracial couple with bi-racial children and are thus members of an identifiable class of persons who are subject to discrimination based upon their race and/or class.

88. Coleman, G and Coleman, M. who is white, intended to discriminate against the plaintiffs on the basis of their race and interfere with the use of their property.

89. Coleman, G. repeatedly harassed and intimidated the plaintiffs with the intent to threaten the plaintiffs based on their race and class which violated their rights under **42 U.S.C. §1982**.

90. The defendants Coleman, G. and Coleman, M. was intent to threaten the plaintiffs based on their race violated the plaintiffs rights under **42 U.S.C. §1982**.

91. Coleman, G. and or his family members repeatedly driving their loud vehicles in front of the Plaintiffs home and thereby revving their engine only in front of the Plaintiffs home was an intent to threaten the plaintiffs based on their race violated their rights under **42 U.S.C. §1982**.

92. Coleman, G. and Coleman, M. also intimidated plaintiffs based on his race when he threatens to come onto the property of the plaintiffs and cause physical harm to the plaintiffs.

93. Coleman, G. and Coleman, M. intentionally caused the plaintiffs to fear that they would harm them by consistently coming in front of the plaintiffs home and making it known that they are present.

94. Coleman, G. and Coleman, M. discriminatory conduct abridged the plaintiffs right to enjoy their property under **42 U.S.C. §1982**.


## COUNT II

VIOLATION OF THE NORTH CAROLINA ETHNIC INTIMIDATION ACT

95. The plaintiff realleges and reincorporate by reference as if fully set forth herein allegations in all preceding paragraphs.

96. The Act provides, in relevant part, (a) if a person shall, because of race, color, religion, nationality, or country of origin, assault another person, or damage or deface the property of another person, or threaten to do any such act, he shall be guilty of a Class 1 misdemeanor. **N.C.G.S. § 14-401.14 (a)** and **(b)** A person who assembles with one or more persons to teach any technique or means to be used to commit any act in violation of subsection (a) of this section is guilty of a Class 1 misdemeanor. **N.C.G.S. § 14-401.14 (b)**

97. Coleman, G. and Coleman, M. hostility and actions as outlined above were taken because the plaintiffs are an interracial couple with bi-racial children.

98. Coleman, G. repeatedly revving his ATV engine in front of the Jetts home, yelling racially "**You Black Ass Bitch**" at plaintiffs shows their hostility towards the plaintiffs.

99. Coleman, G. and Coleman, M. action as outlined above were malicious and taken to intimidate and/or harass the plaintiffs, including but not limited to:

    i.   Repeatedly revving ATV's engine in front of the plaintiff's home

    ii.  Throwing beer cans at the plaintiffs home

    iii. Riding in circles in front of the plaintiffs home

    iv. And other intimidating and discriminatory conduct

100.    The plaintiffs reasonably believed that Coleman, G. and Coleman, M. would cause harm to them and/or their personal property because their actions emphasized that as a neighbor of the Jetts they have unique access to them.

## COUNT III

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

101.    The plaintiff realleges and reincorporates by reference as is fully set forth herein allegations in all preceding paragraphs.

102.    Coleman, G. and Coleman, M. conduct as outlined above was intentional, including but not limited to:

103.    Coleman, G. and Coleman, M., action as outlined above were malicious and taken to intimidate and/or harass the Jetts, including but not limited to:

    i.   Threatening to kill the plaintiffs.

    ii.  Repeatedly revving ATV engine in front of the plaintiff's home

    iii. Yelling from the street when he saw the plaintiffs in their own yard space.

    iv.  Riding in circles in front of the plaintiffs home

    v.  And other intimidating and discriminatory conduct

104.   Coleman, G. and Coleman, M., conduct as outlined above was extreme, outrageous, and such character as not to be tolerated by civilized society.

105.   Coleman, G. and Coleman, M., conduct is considered shameful, extreme, outrageous, and is no longer tolerated in modern society.

106.   Coleman, G. and Coleman, M., acted with a discriminatory intent to cause, or with a reckless disregard for the probability to cause, the plaintiffs humiliation, mental anguish, and substantial and enduring emotional distress. As a neighbor of the plaintiffs, defendants Coleman, G. and Coleman, M., knew that their conduct would directly impact the plaintiffs.

107.   As a direct and proximate result of the Coleman, G. and Coleman, M., action against the plaintiffs, the plaintiffs have suffered and continue to suffer from significant and enduring emotional distress, including humiliation, mental anguish and physical distress, and injury to mind and body.

## COUNT IV

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

108.   The plaintiffs realleges and reincorporate by reference as if fully set forth herein allegations in all preceding paragraphs.

109.   Coleman, G. and Coleman, M. threatened to inflict serious injury on the plaintiffs of a nature capable of causing severe mental disturbance to the plaintiffs.

110.   Plaintiffs suffered actual physical and emotional harm as a direct and proximate result of Coleman, G. and Coleman, M., conduct

111.    The Plaintiffs suffered and continues to suffer from the fairly contemporaneous shock of the threatened or inflicted injury to her father, Raymond, including significant and enduring distress encompassing humiliation, mental anguish and physical distress, and injury to mind and body.

## COUNT V

### NEGLIGENCE

112.    The plaintiffs realleges and reincorporate by reference as if fully set forth herein allegations in all preceding paragraphs.

113.    Coleman, G. and Coleman, M., Powell and Scott owed the plaintiffs a duty of care, including but not limited to:

     i.   Duty not to coerce, intimidate, threaten, or interfere with the plaintiffs in the exercise or enjoyment of their property rights: and

     ii.  An obligation to act in a careful, lawful, and prudent manner and in full compliance with applicable law.

114.    Coleman, G. and Coleman, M., and Powell breached that duty with their conduct as outlined above, including but not limited to:

     i.   Yelling racial slurs at the plaintiffs

     ii.  Threatening to do harm to the plaintiffs

     iii. And other intimidating and discriminatory conduct

115.    As a direct and proximate result of Coleman, G. and Coleman, M., actions against the plaintiffs, the plaintiffs have suffered and continue to suffer from significant and enduring emotional distress including humiliation, mental anguish and physical distress, and injury to mind and body.

116.    Defendant Powell and Scott made false and misleading statements in the

furtherance of their retaliation against the plaintiff, that the plaintiff Jett, R. appointed

himself as the president of the homeowners association to with namely "The Country

Acres Association of Columbus County, Ltd." And thereby falsely changed the

corporation documents when in fact defendant Powell was present when the

homeowners voted and requested that Plaintiff Jett R. take the position of president of

the HOA.

117.    Defendant Powell refused to allow the HOA to collect HOA fee's from the

homeowners pursuant to the CC&R's to go towards the road maintenance.

118.    Defendant Powell refused to allow the members of the HOA to meet to discuss

future plans for the sub division.


## RELIEF REQUESTED

119.    The plaintiffs respectfully requested that this Honorable Court grant the following

relief against defendant Coleman, G. and defendant Coleman, M.:

  i.    Enter a judgment declaring that defendants Coleman, G. and Coleman, M

        violated the plaintiffs right to enjoy their property under **42 U.S.C. §1982**

  ii.   Enter a judgment declaring that defendants Coleman, G. and Coleman, M.

        violated North Carolina Ethnic Intimidation Act.

  iii.  Enter a judgment declaring defendants Coleman, G. and Coleman, M. liable

        to the plaintiffs for intentional infliction of emotional distress and negligence

iv. Enter a judgment against defendants Coleman, G. and Coleman, M. awarding the Jetts compensatory, punitive, and exemplary damages in an amount that is fair and just

v. Enter a judgment against defendants Coleman, G. and Coleman, M. awarding the plaintiffs three times the actual damages they suffered, as they are entitled to under the North Carolina Ethnic Intimidation Act. **N.C.G.S § 14-401.14(a) and (b)**

vi. Grant the plaintiffs reasonable attorneys fees and costs pursuant to **42 U.S.C. §1988**, and pursuant to any other rule or statute allowing for an award of attorneys fees and cost; and

vii. Grant such other and additional relief to which they are entitled as a matter of law and/or equity that the court finds just and appropriate under the circumstances.

120. The plaintiffs respectfully requested that this Honorable Court grant the following relief against defendant Powell and Defendant Scott:

i. Enter a judgment declaring defendants Powell and Scott liable to the plaintiffs for intentional infliction of emotional distress and negligence

ii. Enter a judgment against defendants Powell and Scott awarding the plaintiffs compensatory, punitive, and exemplary damages in an amount that is fair and just

iii. Enter a judgement declaring that defendant Powell reimbursement of fee's and cost of items related to the re-establishment of the homeowners association.

iv. Enter a judgement declaring that defendant Powell reimbursement of fee's and cost of items related to the purchase of speed bumps purchased for installation into country acres sub division main road.

v. Grant the plaintiffs reasonable attorneys fees and costs pursuant to **42 U.S.C. §1988**, and pursuant to any other rule or statute allowing for an award of attorneys fees and cost; and

vi. Grant such other and additional relief to which they are entitled as a matter of law and/or equity that the court finds just and appropriate under the circumstances.

121. The plaintiffs respectfully requested that this Honorable Court grant the following relief as to the rest of the defendants:

i. Awarding plaintiff permanent injunctive setting aside the agreement to terminate the planned community, restraining, and enjoining defendants from engaging in the conduct complained of herein, including, inter alia;

ii. Awarding the plaintiff a permanent injunction directing the defendants to abide by the original Covenant, Conditions and Restrictions to include the collections of dues;

iii. Awarding the plaintiff a permanent injunction directing the defendants to appointment of a management company to oversee the management of the subdivision;

iv. Awarding plaintiff costs and disbursements incurred in connection with this action, including reasonable attorney's fees, expert witness fees and other costs; and

v.  Awarding plaintiff Compensatory, Punitive, Nominal and Liquid damages

for the defendants actions

vi. Granting such other and further relief as the court deems just and proper

vii. Awarding plaintiff costs and disbursements incurred in connection with this

action, including reasonable attorney's fees, expert witness fees and other

costs;

Dated: 12/15/2023                  By _____

**Raymond A. Jett, Jr.**
**Plaintiff, Pro Se**
**170 Emily Drive**
**Chadbourn, N.C. 28431**
**(910) 516-2212-Phone**
**(910)516-2166-Fax**
**rjettjr65@gmail.com**

Dated: 12/15/2023                  By _____

**Tara S. Jett**
**Plaintiff, Pro Se**
**170 Emily Drive**
**Chadbourn, N.C. 28431**
**(910) 516-2212-Phone**
**(910)516-2166-Fax**
tarajett1978@gmail.com